## Constitutional Court.

### CHARLESTON, S. C. 1816.

The State
v.
Joseph Antonio. } INDICTMENT FOR COINING, &c.

THE verdict was, " guilty of passing the dollar knowing it to be counterfeit." The counsel for the prisoner took exception to the jurisdiction of the court to try any offences against the coin ; the jurisdiction thereof being exclusively confined to the court of the United States. The presiding Judge, on the hearing, declared his full conviction, that as to the offence of coining, the court had no jurisdiction, and wished to hear farther argument, as to passing counterfeit

coin. The next day, the argument was again urged, and overruled as to both points, and the cause given to the jury.

During the trial, some instruments calculated to coin money were offered in evidence to show the *quo animo* with which the coin was passed. This was objected to by the counsel for the prisoner, because it operated as a surprise to give in evidence coining instruments, when they would, under the act, constitute a distinct crime; and had the prisoner been apprised of their being alleged against him, by seeing them charged in the indictment, he might have been prepared to rebut the presumption by opposite proofs. This was overruled.

It is submitted, in arrest of judgment, that the courts of this state have no jurisdiction of offences against coin, and that the verdict is inconsistent with the act, uncertain, and no judgment can be given upon it.

1st. Because, since the adoption of the constitution of the United States, the individual states cease to have jurisdiction over the offences against the coin, it being exclusively confined to the United States.

2d. Because, under the constitution of the United States, the individual states have no current coin; but the currency of each state is such solely, because it forms a constituent part of the union : and an indictment, stating the offence to be against the currency of any individual state, and against the peace and dignity of that state, is bad ; for it is also an offence against the United States, and the same act cannot be a violation of two distinct sovereignties.

3d. Because the act under which the prisoner was indicted was passed prior to the constitution of the United States, and values the currency differently from the United States ; who, since the constitution, have the sole right of regulating the value of foreign coins : of course, an indictment following the act must be a false allegation, to wit :

The State
v.
Antonio.

that the coin is current at the value stated in an act of assembly of this state, when the United States have declared it current at a different value.

4th. Because, if under the constitution of the United States the individual states can have a concurrent jurisdiction with the United States in punishing the passing of counterfeit coin, still the counterfeit must be ascertained by a comparison with the value placed upon coin by the United States, and laws passed previous to such a valuation are therefore void.

5th. Because the verdict is so ambiguous, that no judgment can be entered upon it. The indictment alleges, that the prisoner passed a dollar in the likeness and similitude of a Spanish milled dollar ; but the jury have not found that fact, but only that the prisoner passed the dollar knowing it to be counterfeit, referring to any dollar, perhaps a rix dollar or a provincial dollar ; and as no testimony was adduced of any Spanish milled dollar, there remains nothing by which to ascertain, even by reference, that the jury intended to find the fact in issue.

6th. Because the verdict does not find prisoner guilty of any offence ; for the act of 1785 does not punish with death the passing one of the coins, but is in the plural, and the verdict is in the singular.    The act particularly describes the offence, " utter, or attempt to pass, knowing them to be counterfeit."    And in case the foregoing grounds should be overruled , the prisoner moves for a new trial, because the instruments given in evidence might have been put into the indictment, being a distinct felony, and should not have been allowed as mere testimony.

COLCOCK. J.    A due regard to the nature of the federal government, and the principles on which it is formed, will place this case in a clear point of view.

As to the first ground, the federal government possesses

no powers but such as are expressly given to it, or necessarily incident to those given. And the states in the formation of this government surrendered none of the incidents of sovereignty, except such as are enumerated in the 10th section of the 1st article of the constitution, which they are expressly prohibited from exercising. What is there, then, to prevent a state from punishing for coining, or passing coin, knowing it to be counterfeit ? There is no prohibition of the exercise of this jurisdiction in the 10th clause ; and the acts of congress on this subject (2 Graydon's Dig. p. 95.) contains a clause to this effect, " nothing in this act shall be construed to deprive the individual states of jurisdiction under the laws of the several states, over offences made punishable by this act." This is at least a legislative construction of the constitution, and, being made soon after the adoption of the constitution, it may be presumed was done by some of the very men who framed the constitution itself.

But, if a doubt could be entertained upon the subject, we have the exposition of the constitution, by some of the most able of its framers, in a series of papers written in 1788, recommending it to the people, in which will be found the following positions, after stating that the plan of the convention aims only at a partial union or consolidation.

" The state governments would clearly retain all the rights of sovereignty which they had before, and which were not by that act exclusively delegated to the United States. This exclusive delegation, or rather alienation of state sovereignty, would only exist in three cases : 1st. Where the constitution in express terms granted the exclusive authority to the union. 2d. Were it granted in one instance an authority to the union, and in another prohibited the states from exercising the like authority ; and, lastly, where it granted an authority to the union, to which a similar authority in the states would be absolutely and totally contradictory and repugnant."

It is most manifest that this case is not embraced in either of the two first; let us then see if it can be comprehended in the last. Is the exercise of the power to punish, for coining or passing counterfeit coin by the individual states, contradictory and repugnant to the exercise of a similar power by the union? In my opinion, it certainly is not. But I will examine the reasons urged by the prisoner's counsel. First, It is said, there is no instance in the law of a concurrence of jurisdiction in criminal cases. Secondly, That a man might be twice punished; and, thirdly, That a difference in the measure of punishment may, and in this instance does, exist.

As to the first, the history of every country of which I have any knowledge, at least, in which I may say the science of law has made any progress, or the population of which is of any extent, will afford instances of it. The country from whence we draw our system of jurisprudence, certainly affords abundant proof of the existence of a concurrent jurisdiction. Our own country, until very lately, offered proofs of its existence in the county courts, which exercised a concurrent jurisdiction with our superior courts in criminal matters.

As to the second objection, " a man may be twice tried;" this could not possibly happen: first, because it is the established comitas gentium, and is not unfrequently brought into practice, to discharge one accused of a crime, who has been tried by a court of competent jurisdiction. If this prevails among nations who are strangers to each other, could it fail to be exercised with us who are so intimately bound by political ties? But a guard yet more sure is to be found in the 7th article of amendments to the federal constitution.

The last objection may be considered as already removed, by showing that a concurrence of a jurisdiction may exist

In criminal cases, for wherever this does exist, there may, and very frequently will be a difference in the punishment.

But I go farther. When the nature of our compact, and the extent of our country are considered, it may happen that the commission of a crime may be more injurious to the interests of the community in one state than in another; and hence may arise a legitimate ground for a more severe punishment. I would not be understood to mean that that is the case here, but only as intending to show that a difference of punishment is no argument against the exercise of a concurrent jurisdiction.

As to the second ground, it is only necessary to remark, that whatever is the current coin of the United States, becomes the current coin of the individual state. A Spanish milled dollar is a current coin of the United States.

The third ground states that a different value has been fixed by the general government. The indictment took notice of a difference in denomination, but there is in fact no difference in value. The dollar is still the same; and if there had been a difference, it was incumbent on the prisoner to show it, and to prove that the dollar made current by congress was different from the Spanish milled dollar. But there was not even an attempt to do this; and this embraces all that is necessary to be said on the fourth ground.

As to the fifth ground, it is certainly a perversion of language to say the definite article *the* may refer to any dollars. This objection might have been made if the jury had said a dollar. But when the record is read, it proves that the prisoner was indicted for passing a Spanish milled dollar, and the verdict says he was guilty of passing *the* dollar, that is, the dollar charged in the indictment.

The sixth ground is also founded on the misconstruction of very plain language. The act, after enumerating the various coins, says, " any person who shall counterfeit, or

utter, or attempt to pass, knowing them to be counterfeit, any of the aforesaid gold or silver coins," &c., that is, any one of them. It appears to me that the construction contended for by the prisoner would rather amount to this, that a person must pass one or more of each and every different kind enumerated in the act, rather than two of any particular kind, to complete the crime. The word *any* is synonymous with either, as will appear by the authority of all dictionary-makers, and by grammarians, and is defined to be an adjective, meaning one òr more, as the case may be. It must at any rate be allowed, that the word must be taken in that meaning which the legislature have most clearly attached to it. I confess I feel that I am saying more on this ground than it merits.

The last ground merits some attention. When the criminal law writers say, that you shall not give in evidence the stealing of one article, upon an indictment for stealing another ; the reason is obvious : because the articles being separate and distinct in their nature, and the subject of different felonies, the party, although innocent, might be convicted ; for he would not be prepared to defend himself against the larceny of any other article than that specified in the indictment. The rule of law in larceny is, that if an article which has been stolen be found in the possession of one who will not, or cannot, account for the possession, that he shall be adjudged to be the thief. But it is contradictory to common sense, as well as common justice, to apply the rule where a man had not had an opportunity of accounting for the possession. But when a man is charged with coining and passing counterfeit coin, can there be a more direct mode of proving his guilt, than by producing the instruments with which the coin was made ? would it operate as a surprize ? surely the connexion between the offence and the instrument is such, that the accused would naturally

be prepared to account for the possession of the latter, when he came prepared to defend himself against the former. Upon the whole, I am against the motion for a new trial, and in arrest of judgment.

GRIMKE, J. The two general questions in this case are, 1st. Whether the power of trying and punishing persons who counterfeit the current coin of the United States, is vested solely in the congress of the United States ; and, 2dly. Whether the state courts are not likewise deprived of the power of punishing persons passing counterfeit money knowing it to be counterfeit.

With respect to the first point, there can be no doubt that under the 8th section of the first article of the United States' constitution, the individual states gave up to the congress of the United States this power ; for it is there enacted that the congress shall have power to coin money and to regulate the value thereof, and of foreign coin, and to provide for the punishment of counterfeiting the current coin of the United States ; and in the 10th section of the same article, it is declared that no state shall coin money. By these sections, it appears that the power of coining is not only vested in congress, but that the individual states are devested of it.

With respect to the 2d point, it does not appear that the power of punishing persons for passing counterfeit coin, knowing it to be counterfeit, was either expressly given to the congress of the United States, or devested out of the individual states. Now, the 9th section of the amendments to the constitution, as agreed to by the several states, and which has now become a component part of the constitution, declares, that the enumeration in the constitution of certain rights, shall not be construed to deny or disparage others retained by the people ; and in the 10th section of the same, it is farther provided, that the powers not delegated to the United States by the constitution, nor prohibited by it to the

state, are reserved to the states respectively, or to the people. When we examine the powers conceded by the individual states, we find no enumeration of this power given to congress, and when we review the powers denied to the individual states, we discover no mention whatever of their being devested of this power. The individual states were in possession of this power before the ratification of the constitution of the United States ; and if there is no express declaration in that instrument which deprives them of it, they must still retain it, unless they should be devested thereof by construction or implication.

Upon this head it has been argued : 1st. That a man tried by the courts of this state for passing counterfeit coin, would be punished with death ; whereas the act of congress attaches to this crime only fine and imprisonment. But this argument can be of no weight, as in the individual states a greater variety of punishments may be, and probably are, inflicted for this crime ; and, indeed, it is well known that even in this state the punishment of offenders, when convicted under the common law, or the statute law, in some cases is essentially different. The difference, therefore, of the punishment can, in my opinion, be of no avail in the present motion.

It has been farther argued, that congress having the sole power of regulating the value of coin made current in the United States, that part of the act of assembly (Grimke's Coll. 314.) which declares the weight, and regulates the value of the coins therein enumerated, must be considered as repealed by the constitutional provision on that head ; that then it follows, as a matter of course, that the passing of a counterfeit dollar not regulated in its value according to the law of congress, is not indictable under our act of the assembly. But the regulating of the weight and value of good coin is very different from the passing of bad and coun-

terfeit coin.   There can be no doubt, that from the regula-
tion of the value of the coin by congress, that all the states,
and every individual in them, is bound by such valuation
and such restriction.   It is the general law of the land, and
must be observed by all, for it is founded on powers given
to congress and renounced by the states.   It cannot, how-
ever, be concluded thence, that because this exclusive right
of regulating the value of coin is vested in congress, that,
therefore, they have the sole right of punishing the crime
of passing counterfeit coin.

But the act of congress of the 21st April, 1806, 2 Gray-
don, 95., contemplates a case of this kind, and that whenever
it does happen, that a state shall have previously provided
by law for this offence of passing counterfeit money, it shall
not be deprived of the power of punishing it ; for, in the
fourth section, it declares that nothing in that act contained
shall be construed to deprive the courts of the individual
states of jurisdiction under the laws of the several states,
over offences made punishable by this act.   Here is an
explicit acknowledgment on the part of the United States,
that the individual states were previously possessed of this
power ; that it was not abandoned by the individual states on
the ratification of the constitution ; and that the courts of the
United States, to whom this act gives a concurrent jurisdic-
tion, (whether constitutionally or not, is not for me to say,)
with the state courts, shall not construe this power given to
them, so as to deprive the state courts of their right of ju-
risdiction in a case of this kind, viz. the passing of foreign
counterfeit coin.

I will allow that this state court has no jurisdiction whatever
over money coined at the mint of the United States, nor any
that is not particularly enumerated in our act of assembly;
but to counterfeit any species of coin which is brought from
foreign nations , and which has been declared current by act

CHARLES-
TON,
1816.

The State
v.
Antonio.

of assembly, is an offence against that act of assembly, and punishable by this court.

Another argument of great importance is, that an offender might be twice tried for the same offence ; once under the act of congress, and again under the state act. But if the courts of the United States have a concurrent jurisdiction over this crime, with this court, then must either court allow of the plea of autrefois acquit, which will be a good bar to a second prosecution, because a determination in a court having competent jursdiction, must be final and conclusive on all courts of concurrent jurisdiction. 1 Leach, 160.

I do not however mean to allow, that the courts of the United States have such concurrent jurisdiction with this court ; but, as I have said before, that is not a point for me to determine. I am only called on to decide, whether the prisoner at the bar is amenable to our courts for the offence of which he has been found guilty.

It has likewise been argued, that the verdict is so ambiguous, that no judgment could be entered up thereon. The indictment charged the prisoner with passing a dollar in the likeness and similitude of a Spanish milled dollar ; the dollar was produced in evidence, and the jury have found him guilty of passing *the* dollar, knowing it to be counterfeit. How it is possible in a case of this kind, and with such testimony to give a more pointed, definite, legal verdict, I cannot divine.

As to the objection that the act of assembly speaks of coins in the plural, and here the party is convicted of passing only one piece, and therefore the conviction is wrong, I think the act of assembly extends to the passing of one piece as well as many, for the words are, " any person who shall utter, knowing them to be counterfeit, any of the aforesaid coins." Now, the word *any* means any one, any two, or any more ; for, if this was not the construction, then one who was indict-

ed for passing two pieces, might raise the same objection and say, that the act means more than two, or that it meant all of them. My opinion on this point I find confirmed by a similar case in 1 Leach, p. 1. Hassel's Case. Upon the whole, my judgment is, that the indictment is properly framed upon our act of assembly; that that act is of force quoad the punishment of persons passing counterfeit coin mentioned in that act; that the verdict is full, precise, and definite; and that, therefore, the motion must be discharged.

BAY, J. The prisoner was indicted under the act of 1783, passed by the egislature of this state, against counterfeiting the gold and silver coins made to pass current within this state. Among those coins the Spanish milled dollar is mentioned; and, indeed, is made the standard by which the relative value of all the other coins are regulated and ascertained.

The indictment, as usual in such cases, contained two counts: 1st. One for counterfeiting. 2d. The other for passing a Spanish milled dollar, knowing it to be counterfeit. The second clause of the above mentioned act, declares, " that any person who shall counterfeit or utter, or attempt to pass, knowing them to be counterfeit, any of the aforesaid gold and silver coins, or keep in his or her possession any stamp, dye or mould for coining the same, upon being duly convicted thereof, shall be adjudged guilty of felony, and suffer death without benefit of clergy."

The attorney-general did not attempt to press the evidence against the prisoner, under the first count for coining. Under the second count, the evidence was very clear and conclusive as to the passing of the counterfeit dollar stated in the indictment by the prisoner; and, as to the baseness of the metal of which it was composed; the scienter, or knowlege of this baseness of the metal, was in red from sundry suspicious circumstances proved on the trial.

CHARLES-
TON,
1816.

The State
v.
Antonio.

Such as some other base money being passed at or about the market, and other places in its vicinity, and supposed to be by prisoner and one of his associates, and particularly by a box found in his trunks, after he was apprehended, containing sundry instruments, which had the appearance of coining instruments, and also sundry materials for that purpose.

Upon the trial, an objection was made to the offering these instruments, &c. found in prisoner's trunk, as evidence against him ; as it was alleged that this fact of his having instruments in his possession for coining, of itself formed a distinct and separate felony by the act, for which he might be tried and punished. So that one felonious act ought not to be given in evidence to support another. After hearing arguments in favour of the objection, the court admitted that one felony could not be given in evidence to support another ; as, for instance, the stealing of a horse could not be given in evidence to prove a man guilty of stealing a negro, because they are independent and distinct offences ; both susceptible of external proof. But when a *scienter* was to be proved, it must be drawn from circumstances. This species of evidence lies deep in the human breast, beyond the reach of mortal ken. To find out this knowledge, therefore, is always a difficult research, and it must be drawn from circumstances, indicative of the operations of the mind ; and at last, a reasonable presumption is all that can be obtained or acquired ; all the legislators and lawyers on earth can go no farther. It was, therefore, under these impressions, that the Circuit Court permitted these forging instruments, found in prisoner's possession, to be given in evidence to the jury ; not, as has been stated, to prove the offence of passing the counterfeit money, but as a circumstance to show that he must have had a knowledge of the baseness of the metal of which the false dollar was composed.

And unless circumstances of this kind, or those of a simi-
lar nature, were permitted to be given in evidence to a jury,
all that class of cases or offences where a knowledge of the
falsehood, of any kind or nature whatever, forms or consti-
tutes the principal ingredient of an offence, must fall to the
ground, and the means of punishment must become useless
and inoperative.

It is also true, that on the trial an objection was taken to
the jurisdiction of a state court to try this offence under the
act of 1783. It was contended that the constitution of the
United States, and the acts of congress made in pursuance
thereof, had virtually repealed this act, and that this offence, if
any had been committed, belonged exclusively to the courts
of the United States. Both these objections were overruled ;
the first on the ground that the state of South-Carolina, in the
year 1783, when this act was passed, being a sovereign and
independent state, there was nothing to circumscribe her
powers and jurisdiction, or to limit her authority to pass the
law in question, which was then soon after the revolutionary
war justified by the wisest and soundest policy, in order to
prevent the introduction and circulation of base and false
metal, under the appearance and similitude of foreign coins,
which, at that period, abounded in the state. 2d. On the
ground that congress, being a delegated body from the dif-
ferent states, possessed no original jurisdiction. Every
power that body possessed was derived from the states, and
nothing was within its authority but what was expressly
given by the constitution that gave it being. That this con-
stitution might well be compared to a special letter of
attorney from principals to agents, to do and perform certain
specified acts, beyond which their powers were at an end.
That these principles being conceded, and indeed they could
not be denied, there was not any thing in the constitution
which went directly or indirectly to repeal the act in ques-

tion, or to prevent the state of South-Carolina from punish-
ing the offence of passing counterfeit money, stated in the
second count of the indictment.

The case then went to the jury, and they found the pri-
soner guilty under the second count in the indictment, " of
passing the dollar, knowing it to be counterfeit." The fore-
going is a concise history of the case as it passed on the trial.
From this verdict, the counsel for the prisoner appealed on
a number of grounds.

As to the first ground I remain of the same opinion as at
the trial. I cannot concede that the power of punishing this
offence is taken away from the state ; and even doubt whe-
ther the courts of the United States have so much as a con-
current jurisdiction. It is true the constitution of the
United States, provides for counterfeiting the current
coin of the United States ; but by the terms " current coin,"
which are coupled together with "securities" in the same
sentence, is clearly to be understood the money coined at
the mint of the United States, and which is very emphatically
called the current coin of the United States. It was to guard
and protect these, and these only, from being falsified and
debased, that this power of providing a punishment for
counterfeiting was given to congress. Not a sentence or a
word is said about providing a punishment for passing
counterfeit foreign coins, in this part of the section. The
current coins therein mentioned must be taken in contra-
distinction to the foreign coins mentioned in the preceding
sentence, whose value was only to be regulated by congress ;
but nothing is said about counterfeiting them, or about pro-
viding for the punishment of passing them, knowing them
to be counterfeit.

If this construction is correct, and I trust it will be found
upon a close examination, to be a true one, then it will
result as a necessary consequence, that no power whatever
is given by the constitution to congress to punish for coun-

terfeiting foreign coins, or passing them, knowing them to be counterfeit, within the United States. That power remains, and must of necessity remain with the individual states, who still retain all their original powers of independent sovereignties, not specially delegated to congress. The offence of passing counterfeit foreign coins is an evil of great magnitude, for millions of base dollars might be brought into the state and circulated, and if the state had not the power of punishing the offence, the evil must go unredressed. This offence therefore must be punished by the state laws, or go off with impunity : and so sensible was congress of the necessity of referring this offence to the state courts throughout the union, that in their act of 1806, when providing for the punishment of passing the current coin of the United States, knowing it to be counterfeit, they inserted a provision that whenever it should happen that any state should have previously provided by law for this offence of passing counterfeit money, it should not be deprived of the power of punishing this offence. And that nothing, in the said act contained should be so construed as to deprive the state courts of jurisdiction under the laws of the several states. 2 Graydon's Digest, 95.

Here, then, is a saving and a reservation of the right of the state courts to punish this offence under state laws, if any such salvo or reservation was necessary. But in truth, this right was never given up by the states. So that this retrocession, if I may be allowed the expression, on the part of congress, was an unnecessary act. It serves however to show how very doubtful that body was, as to its exclusive power and jurisdiction over this offence.

As to the second general ground, taken on the argument in the court of appeals, with respect to the constructive surrender of this right or power to the United States ; the advocates for exclusive jurisdiction on the part of the

CHARLES-
TON,
1816.

The State
v.
Antonio.

United States, foreseeing that there was no express cession of this right in the constitution, have resorted to construction, and have contended that the power of punishing this offence is implied in the terms of the constitution. I have already observed that congress had no original jurisdiction, and possesses now none but what is given to it by the states.

The twelfth article of the amendments declares, " that all powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people." Here, then, is an express reservation of all powers not expressly given, which, in my opinion, cuts off forever all constructive or implied powers. And, indeed, it is a principle which governs all corporate bodies, that nothing shall ever be presumed to be within their jurisdiction but what is expressly given.

The conclusion I draw from all the foregoing premises under this head is, that as the constitution has not expressly given to congress the power of punishing the passing of foreign coins, knowing them to be counterfeit, that body has no constructive or implied power to do so ; and that as South-Carolina, being a sovereign and independent state, had a right and power to punish this offence and to pass any law for that purpose ; and, by passing the act under consideration, has done so ; there is nothing in the constitution of the United States which repeals it. Finally, that the act, as to that particular offence, remains in full force and operation.

3d. As to the admission of the coining instruments, and materials found in prisoner's possession, to prove the *scienter*, or knowledge of the counterfeit, or baseness of the metal, I have nothing to add to the opinion I delivered to the jury on the trial, and which is mentioned in a former part of this opinion, farther than that a majority of the judges of this state concurred with me in opinion, at Columbia, on this point, in the case of Odell, who was tried at Pendleton,

October, 1815: On all the grounds, I am against the motion in arrest of judgment, and also against the motion for a new trial.

NOTT, Justice, dissented.   All the grounds taken in arrest of judgment in this case may be reduced to two : 1st. Whether under that section of the constitution of the United States, which give to congress the power " to coin money, to regulate the value thereof and of foreign coin, and to provide for the punishment of counterfeiting the securities and current coin of the United States, article 1. federal constitution, section 8th," is also given the power to provide for the punishment of passing any of the current coin thereof, knowing it to be counterfeit.  2d. If it is whether the states by delegating such power to congress, have constructively parted with all the powers which they had before over the subject, and vested it exclusively in the general government.

Before I proceed to a particular examination of those questions, I would premise that the United States must be held to possess all the attributes of sovereignties in the most ample degree, over all matters expressly delegated to them by the constitution, as well as over all such as are necessary to carry those so delegated into effect ; and among those the power to carry their own laws into operation by providing proper punishment for them, is one.   That cannot be considered a sovereign independent state which depends on another to carry its laws into execution.   A want of this power was the great objection to the old confederation, and to remedy the evil was a great object of the new one.   This would be very badly effected by merely granting such power to the general government, and leaving the individual states the power to arrest it, by interposing their own laws. The constitution in my opinion admits of no such construction.   The judicial power of the United States is not only

CHARLES-
TON,
1816.

The State
— v.
Antonio.

constructively, but expressly made commensurate with the legislative. It is made to extend " to all cases arising under the laws of the United States." The words are, " The judicial power (of the United States) shall extend to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made under their authority." This is a case " arising under a law of the United States," for by the act of congress, it is made highly penal to counterfeit the current coin of the United States, or to pass it knowing it to be counterfeit. Unless, therefore, that act of congress is unconstitutional, this is one of the cases expressly and exclusively delegated to the courts of the United States ; for if their power extends to all the cases of this decription, there can be none to which it does not extend.

It is no answer to say it is a case also arising under a law of the state, for the constitution expressly declares that " this constitution and the laws of the United States which shall be made in pursuance thereof, shall be the supreme law of the land, and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding." Any act of a state, therefore, repugnant to a constitutional act of congress immediately becomes a dead letter. This construction may also be inferred from the nature of the other cases enumerated in the same section of the constitution, " all cases affecting ambassadors, other public ministers and consuls, and all cases of admiralty and maritime jurisdiction." I believe it is not pretended that the jurisdiction of the state courts extends to cases of this description ; yet the same construction that would extend it to " cases arising under a law of the United States," would embrace those also.

This construction is farther strengthened by a view of the class of cases which immediately follows in the same

section of the constitution, "to controversies to which the United States shall be a party; to controversies between two or more states, between citizens of different states, &c. In these cases, and those connected with them, the word "all," is dropped; thereby leaving to the state courts jurisdiction concurrent with the courts of the United States. If then this is one of the cases over which the general government has exclusive jurisdiction, the state law becomes inoperative; for a state cannot give to itself jurisdiction by legislating on a subject exclusively assigned to the United States.

This brings us to the inquiry, whether the act of congress, providing for the punishment of passing counterfeit money, knowing it to be counterfeit, is constitutional; the consideration of which will be involved in the question first above made in arrest of judgment.

That congress have power to coin money, to regulate the value thereof, and of foreign coin, and to provide for the punishment of counterfeiting it, is admitted. It is also admitted, that they have the power to make all laws which shall be necessary for carrying into execution the foregoing powers. Is it necessary, then, to enable congress to carry into execution the power to coin money, to regulate the value thereof, and to provide for the punishment of counterfeiting it, that they should have power to punish for passing it, knowing it to be counterfeit? If it is, then that power is expressly delegated to them. Or, to put the question in another form, is it necessary to protect the current coin of the United States, by imposing penalties on those who shall pass it, knowing it to be counterfeit? If it is, then to afford it that protection is one of the powers expressly delegated to the general government. Indeed, to use the words of an eminent commentator on the constitution, (1 Fed. 299.) "Had that instrument been silent on this head, there can be no doubt that all the particular powers would

have resulted to the general government by unavoidable implication. No axiom is more. clearly established in law, or in reason, than that whenever the end is required, the means are authorized ; whenever general power to do a thing is given, every necessary power to do it is included : and that such protection is necessary to the current coin of the United States, no farther proof can be required than that congress and all the states in the union, (as long as they had power over the subject,) have furnished it. To have given to congress the power to punish counterfeiters of the coin, while those who circulated it were to go unpunished, would have furnished it but little security ; and to have left this important power to the courtesy of the states, would have been sliding back into the same situation which we were in under the old confederation, and defeating the principal object for which the new one was formed.

Being of opinion, therefore, that congress have not only the power of punishing for counterfeiting the coin of the United States, but also for passing it, knowing it to be counterfeit, it only remains to examine the second question, to wit : whether the states, by delegating such power to congress, have parted with all power over the subject them-selves.

It is a matter of no small difficulty to mark out with precision the line of jurisdiction between the United States and the individual states ; and perhaps we shall not meet with a more correct view of the subject than is taken by the same eminent writer before quoted. He reduces the exclusive delegation of power to the United States, or the alienation of state sovereignty, to three cases : 1st. Where the constitution in express terms grants exclusive authority to the union : 2d. Where it grants in one instance an authority to the union, and in another prohibits the states from exercising like authority : and, 3d, Where it grants an authority to

the union, to which a similar authority in the states would be absolutely and totally contradictory and repugnant. Under this last case, he instances that clause which declares that congress shall have the power " to establish a uniform rule of naturalization throughout the United States." This, observes the writer, must necessarily be exclusive, because if each state had the power to prescribe a distinct rule, there could be no uniformity. Now if the United States have the power to " regulate the value of money and of foreign coin, and to provide for the punishment of counterfeiting the current coin of the United States, they must have the exclusive jurisdiction ; otherwise, two governments equally sovereign and independent, would have jurisdiction over the same subject ; and the value of the coin, and the punishment for counterfeiting, might be different in every state. The exercise of such authority by the states would be " absolutely and totally contradictory and repugnant" to the exercise of it by the United States. Indeed, concurrent jurisdiction in criminal cases, between independent governments is incompatible with sovereignty ; and the United States and the individual states are as sovereign and independent of each other in all cases of a criminal nature within their respective jurisdiction, as the states themselves are.

We need only look to the consequences of a contrary doctrine, to be convinced of this truth. The United States punish the counterfeiting or passing of counterfeit money with fine and imprisonment; the state of South-Carolina punishes the same offence with death. If a man, put on his trial for such an offence should plead in bar a conviction or acquittal in a court of the United States, would such a plea be sustained by our courts ? Or, let the punishment be reversed ; and would such a plea be sustained in a court of the United States ? It is impossible not to see that it would not and ought not. Neither the courts of the United States,

nor of the individual states will hold an acquittal or conviction by one, a bar to a trial by the other. Each must and will insist upon the right of inforcing its own penal laws, and its jurisdiction cannot be usurped by the other. The right to punish, (says an eminent writer, " arises from the right of self defence." A state commonly punishes offences against its own laws; and an offence against the laws of the United States, is no offence against the laws, or against " the peace and dignity" of the state of South-Carolina. One, therefore, must have whole jurisdiction, or a person may be twice punished for the same act; first fined and imprisoned by the courts of the United States, and then hanged by the state, which is not only contrary to the express letter of the consitution, but contrary to the eternal and unerring principles of justice.

The case put of concurrent jurisdiction of courts in the same state is not analagous. There the offence is against the same laws and against the same sovereignty; the crime and punishment are the same, and the law is satisfied with a trial in either tribunal having jurisdiction.

The rule then must be a correct one, that where any power is delegated to the United States, and the exercise of such power by an individual state is incompatible with such delegation, it must exclusively belong to the general government. The advocates for a concurrent jurisdiction derive no support from the amendment of the constitution which has been relied on. It does not say that the powers not expressly delegated, &c. shall be reserved; but that the enumeration of certain rights shall not be construed to deny or disparage others retained by the people; and whether by express or necessary implication, the effect is the same.

It is farther argued that prohibiting the states from making any thing but gold silver a tender in the payment of debts, necessarily implies a power in them to make those so. In answer to which, after what has been already said, I will

only observe that I am not disposed to admit such an infe-
rence. Admit it, however, to be correct, it only proves,
that a state may make certain foreign coins current within
their respective jurisdictions, which are not made so by
congress. But that introduces no conflict of jurisdiction.
For the power of congress to punish extends only to the
current coin of the United States. Until, therefore, con-
gress have made a foreign coin current in the United States,
they cannot punish for counterfeiting it. But that was not
the ground on which this case was decided in the court
below, neither has it been made a ground of argument here.
It is not contended on the part of the state that the money
passed by the prisoner was not the current coin of the United
States.

I cannot feel the force of the distinction taken between
the coin made in the United States, and the foreign
coin made current here. The words of the constitu-
tion are, " current coin," which I understand to mean as
well foreign coin made current by act of congress, as coin
made at the mint of the United States. The conclusion,
therefore, that I have come to is, that the power of punish-
ing the counterfeiting of foreign coin made current in the
United States by act of congress, or passing the same, know-
ing it to be counterfeit, belongs exclusively to the general
government, and the trial of persons for those offences be-
longs exclusively to the courts of the United States. The
administration of criminal justice is not a privilege which we
ought to be anxious to retain, though a painful duty which
we are sometimes bound to perform.

I am of opinion the judgment ought to be arrested for
want of jurisdiction. But as a majority of the court differ
from me on this point, it becomes necessary to give an opi-
nion also on the ground of a new trial. The first ground is,
that as our act makes it a distinct capital crime to keep im-
plements for counterfeiting money in one's possession, such

CHARLES-
TON,
1816.

The State
v.
Antonio.

evidence ought not to have been admitted in the court be-low on an indictment for merely passing counterfeit money. Having given an opinion on this point in another case, I do not feel under any necessity to go fully into the reasons for the opinion I now give. I take the rule of law to be, that one distinct offence shall not be given in evidence to convict a person of another, unless a proof of one goes directly to prove the other. Thus, for instance, proof that the defendant made the identical dollar in question, might have been proper, because it would have proved unequivocally that he knew it to be counterfeit. But proving that he had implements for coining in his possession, did not prove that he knew this dollar to be counterfeit, any more than proving that a man stole a horse, for which he was not indicted, would be proof that he stole another for which he was indicted. Unless, indeed, there was some proof, by comparison or otherwise, that these were the moulds in which the dollar passed by the defendant was cast. Rex v. Ball, 1 Campbell, 324. I am in favor of the motion in arrest of judgment as well as for a new trial.

Grimke, for motion.

Attorney-General and Hunt, contra.